UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.  No. 3:07cr60 (SRU)

ALBERT LOPEZ

## RULING ON MOTION TO SUPPRESS

While the defendant, Albert Lopez, was on supervised release, several Deputy United States Marshals ("DUSMs") and several Ansonia Police Officers (collectively "law enforcement agents") entered his house and arrested him for a violation of supervised release. Lopez lived in the house with his girlfriend, Angelica Repollet, who was also present during the arrest. After the law enforcement agents placed Lopez in handcuffs downstairs, one of the DUSMs accompanied Repollet upstairs to retrieve clothing for Lopez. While in an upstairs bedroom, the DUSM saw drug residue and paraphernalia on a nightstand. The DUSM testified that he asked for and obtained Repollet's consent to search the room. During the search, agents found a loaded Taurus .357 Magnum revolver under a pillow on the bed. Lopez was subsequently charged with several crimes related to the firearm, including knowing possession of a firearm by a convicted felon pursuant to 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Lopez now moves to suppress the firearm, arguing: (1) that Repollet did not consent to the search of the bedroom; (2) that if Repollet gave her consent, the consent was not voluntary; and (3) that if Repollet gave voluntary consent, the consent was not valid under *Georgia v. Randolph*, 547 U.S. 103 (2006). The government argues that Repollet gave voluntary and valid consent to search the bedroom. Moreover, the government argues that regardless of whether the agents properly obtained Repollet's consent, the search of the bedroom was nevertheless

reasonable because Lopez had a substantially reduced expectation of privacy.  Because I hold that Repollet's consent was voluntary and not invalid under *Georgia v. Randolph*, the law enforcement agents' search of Lopez's bedroom did not run afoul of the Fourth Amendment.  As such, I need not reach the question of Lopez's expectation of privacy.

**I.    Background**

The following facts are derived from Repollet's affidavit and from evidence presented at a two-day hearing on the instant motion, which included testimony from DUSMs Lawrence J. Bobnic, Michael Moore, and James Masterson, as well as Angelica Repollet, and Lopez's daughters, Elizabeth Lopez and Larisse Lopez.

In 1991, Lopez pled guilty to one count of Conspiracy to Distribute Cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1).  On September 17, 1991, Lopez was sentenced to 140 months' imprisonment and five years' supervised release.  Lopez was subsequently convicted of possession of contraband by an inmate (heroin) pursuant to 18 U.S.C. §§ 1791(a)(1) and (2).  On December 11, 2003, Lopez was released from custody.  On July 5, 2006, while on supervised release, Lopez failed a drug test.  Brendan Pierpaoli, an officer from the United States Probation Office ("USPO"), made numerous efforts to contact Lopez, but Lopez failed to respond.  On September 23, 2006, the USPO initiated violation proceedings against Lopez, alleging that he failed to comply with two standard conditions of probation, namely, reporting to the USPO and refraining from use of any illegal controlled substances.

On September 23, 2006, a warrant issued for Lopez's arrest.  The USPO arranged for the United States Marshal Service ("USMS") to apprehend Lopez.  DUSM Bobnick determined that Lopez was probably staying with Repollet, his girlfriend, at her house in Ansonia, Connecticut.

Tr.[1] at 17-18. On the morning of October 2, 2006, the date of the arrest, DUSMs Bobnick, Moore, and Masterson met with and briefed several members of the Ansonia Police Department about the arrest. Tr. at 21. At approximately 6:15 a.m., the DUSMs, accompanied by three Ansonia Police Officers, proceeded to Repollet's house to arrest Lopez. Tr. at 20-21. All of the law enforcement agents were armed and wearing bullet-proof vests. Tr. at 20. The Ansonia offers were wearing standard police uniforms, and the DUSMs were wearing plain clothes. Tr. at 21.

As the law enforcement agents approached the dwelling, they set up a perimeter around the building. Tr. at 22. From outside the house, one of the law enforcement agents saw Lopez looking out a window on the second floor the house. He motioned for Lopez to come downstairs. Tr. at 22-23. DUSMs Bobnick and Moore, and two Ansonia Police Officers approached the front door. Tr. at 22. After knocking on the front door, they entered the house with their guns drawn. Tr. at 23. Several women were present in the living room, including Repollet, and Lopez's two daughters. Tr. at 23. A pit bull was barking excitedly. Tr. at 23. The law enforcement agents asked the women to secure the dog, and Repollet complied. The law enforcement agents immediately asked where Lopez was. Tr. at 23. Bobnick and Moore then went to the bottom of the stairwell and ordered Lopez to come downstairs. Tr. at 24. Lopez did not immediately comply, and after a few moments, it appeared to Bobnick as though he would have to go upstairs to apprehend Lopez. Tr. at 24. Bobnick and Moore began to ascend the stairs with their weapons drawn, but Lopez quickly appeared at the top of the stairs with his hands up. Tr. at 24-25. Bobnick and Moore backed down the stairs and ordered Lopez to come downstairs.

---

[1] Transcript of Suppression Hearing held on July 26, 2007.

Tr. at 25. Lopez complied, and when Lopez reached the bottom of the stairs, Moore placed him in handcuffs. Tr. at 25-26. Bobnick holstered his weapon. Tr. at 25. When Moore placed Lopez in custody, Lopez was wearing only a pair of mesh shorts. Tr. at 26.

The events that subsequently occurred are somewhat in dispute. Bobnick testified that he sought appropriate clothing for Lopez pursuant to the USMS policy. Tr. at 26-27. He asked the several women if Lopez had clothing, and then, for safety reasons, accompanied Repollet upstairs to obtain the clothing because the law enforcement agents had not "cleared" the second floor of people and weapons. Tr. at 27. When asked to describe Repollet's emotional condition at the time, Bobnick testified Repollet may have been "misty-eyed." Tr. at 28. Bobnick also noted that Repollet appeared pregnant at the time. Tr. at 28.

Bobnick testified that, immediately upon entering the bedroom, he saw a plate with a white powdery residue on it, and a dollar bill rolled up into the form of a straw. Tr. at 33. Bobnick also saw a dollar bill that was folded into a pouch, which contained what appeared to be narcotics. Tr. at 33. Bobnick then asked Repollet "whose bedroom this was," and Repollet responded that she and Lopez slept in the room. Tr. at 38-39. Bobnick then asked if there were any other narcotics in the room, and Repollet indicated that she did not know. Tr. at 39-40. Bobnick then asked Repollet for consent to search the bedroom for additional narcotics and weapons and Repollet responded affirmatively. Tr. at 40.

Bobnick testified that he then asked Repollet to sit at the foot of the bed and went outside the bedroom into the hallway to call DUSM Masterson to witness the consent, and to assist with the search. Tr. at 40. He asked Repollet to sit at the foot of the bed for his own safety because he planned to turn his back on her, and to prevent her from destroying any evidence. Bobnick never

-4-

handcuffed Repollet, nor did he use any physical force to restrain her. Tr. at 43. His gun was not drawn. Tr. at 43. He never indicated to Repollet that she was under arrest, or might be under arrest. Tr. at 43. Bobnick testified that Repollet appeared misty-eyed, but in control. Tr. at 44.

When Masterson came upstairs and entered the bedroom, Bobnick again asked Repollet for consent in Masterson's presence. Tr. at 44. Bobnick did not recall the exact words he used to request consent, but he indicated that he referenced the earlier consent Repollet had given, and Repollet again gave her verbal consent to search. Tr. at 44. In the report he subsequently wrote up regarding the arrest and search, Bobnick mentioned only one instance when Repollet gave consent. Tr. at 47-48.

Bobnick testified that he and Masterson then began to search the bedroom. Tr. at 48. Almost immediately, Masterson went to right hand side of the bed, flipped up a pillow, and found a loaded Taurus .357 Magnum revolver. Tr. at 48. Moments after Masterson found the revolver, Moore entered the room and reported that he had found a fairly sizable wad of cash in Lopez's shorts during the pat-down incident to Lopez's arrest. Tr. at 49. Bobnick testified that, after the revolver and cash were found, Repollet began to sob and hyperventilate. Tr. at 51. Repollet was given a paper bag to breathe into. Tr. at 51-52. Bobnick indicated that the hyperventilating ended quickly. Tr. at 52. The law enforcement agents subsequently removed Lopez from the house.

Finally, Bobnick testified that, for the entire time that the law enforcement agents were at the Ansonia address, including the time when Bobnick asked for and received Repollet's consent, the law enforcement agents could communicate with each other both by raising their voices and through the "walkie-talkie" feature of their Nextel cell phones. Tr. at 65.

Repollet testified to a somewhat different version of events. She asserted that, after Lopez was placed in handcuffs, he asked her to get him a sweater and some sneakers. She then proceeded upstairs, and did not realize that any of the law enforcement agents were following her until she reached the top of the stairs and the entrance to the bedroom. As soon as they entered the room, she was ordered to sit on the floor at the foot of the bed. She indicated that she immediately began having trouble breathing and became light-headed, that she was anxious and panicked. Repollet testified that she was not able to speak at any point while she was in the bedroom, had no conversation with any of the law enforcement agents, and does not remember any of the law enforcement agents specifically addressing her. Finally, Repollet testified that she did not recall any of the law enforcement agents ever asking for consent to search the bedroom.

On cross-examination, the government elicited testimony indicating that Repollet has previously given inconsistent testimony related to this case. Specifically, Repollet's testimony before the grand jury about Lopez's prior gun possession was inconsistent with subsequent statements she made to law enforcement. In addition, the government elicited testimony regarding Repollet's potential interest in the outcome of the case. Repollet testified that she gave birth to Lopez's child, and that she loves Lopez and wishes he could help raise her child. Repollet and Lopez cosigned the lease for the Ansonia apartment, and Lopez helped her pay rent. Repollet also testified that Lopez is a jealous man, and has threatened to kill her.

## II.  Discussion

Warrantless searches "are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Searches pursuant to valid consent represent one exception to the warrant

requirement. The Supreme Court has held, however, that "when a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The government must prove the voluntariness of a suspect's consent to search by a preponderance of the evidence. *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983).

        A.      <u>Did Repollet Give Voluntary Consent to Search the Bedroom?</u>

Consent is voluntary if the consent was given as "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Whether an individual has validly consented to a search is fact-intensive and is determined by the "totality of all the circumstances." *United States v. Isiofia*, 370 F.3d 226, 230-31 (2d Cir. 2004) (citations omitted). Among the factors courts consider in the totality of the circumstances are the individual's "age, education, intelligence" the government's "use of physical punishments or deprivations," and "whether the alleged consenting person was advised of his constitutional rights." *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir. 1986). In addition, the Second Circuit has held "in cases where consent is obtained from a person in custody, that whether guns were drawn or the consenting individual was frisked . . . or whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing consent to the search . . . [are] relevant factors in determining the voluntariness of the consent." *Id*. at 243-44 (citations omitted). An individual's consent is not voluntary when the individual merely acquiesces and submits to "apparent lawful authority." *United States v. Sanchez*, 635 F.2d 47, 59 (2d Cir. 1980). "The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v.*

*Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (quotations and citations omitted).

In this case, Lopez argues that Repollet did not give consent at all. Repollet's testimony, however, is not entirely reliable on this point. Both Masterson and Bobnick testified that she did give her consent, at least twice, and that both Masterson and Bobnick were present the second time she consented to the search. Moreover, in her own testimony, Repollet never expressly denied giving consent; she simply asserted that she did not remember giving it.

Lopez also argues, in the alternative, that even if Repollet did consent, her consent was not voluntary. Several facts support her claim. Four law enforcement agents entered her house very early in the morning with a substantial show of force. They had their weapons drawn, and the scene was somewhat chaotic. There were at least four people and a barking pitbull in the living room when the law enforcement agents entered. The marshals gave the women in the living room, including Repollet, certain orders with which they were clearly required to comply, including a request to secure the dog. Later, Repollet received an order to sit at the foot of the bed. When Lopez came down the stairs, at least two law enforcement agents had their guns drawn and aimed directly at him. The totality of the events understandably upset Repollet, who was pregnant with Lopez's child at the time.[2] Repollet was misty-eyed when Bobnick asked for

---

[2] Repollet testified that, before she gave her consent, she was hyperventilating and having a panic attack. Bobnick testified that Repollet was only misty-eyed at the time, and did not hyperventilate until after she had seen the law enforcement agents recover the drug paraphanelia, revolver, and cash.
  Again, Repollet's testimony on this point is not entirely reliable. She did not recall many of the details about the events unfolding around her that early morning, including but not limited to the fact that a police officer escorted her up to the bedroom, and any conversations that she had with any of the law enforcement agents while upstairs. By sharp contrast, the three DUSMs who testified at the hearing remembered the consent and the search and were able to describe it in fairly extensive detail.

consent to search, and none of the law enforcement agents told Repollet that she had the right to refuse consent.

But the chaotic scene during Lopez's apprehension quickly dissipated. The law enforcement agents holstered their weapons. Although Bobnick told Repollet to sit at the foot of the bed while he went into the hallway to call Masterson, Repollet had by then already given her consent to search the bedroom. She was never physically detained, or touched by the law enforcement agents in any way. The agents did not frisk her or threaten to arrest her. She was in her own home, and the testimony adduced at trial indicated that she and the other individuals in the house, besides Lopez, were free to walk around the house at the time. Indeed, at least one checked up on Repollet while she was in the bedroom. When Repollet first gave her consent, only she and Bobnick were present, and Bobnick asked for consent in a conversational tone. None of the law enforcement agents deceived or intimidated Repollet. And most significantly, Repollet gave consent to search the bedroom at least twice. Considering the totality of the circumstances, I find that Repollet's consent was voluntary.

    B.    <u>Does the Law Enforcement Agents' Failure to Ask Lopez For His Consent Invalidate Repollet's Consent Under *Georgia v. Randolph*?</u>

It is well-established that valid consent to search an area can be given by anyone with "common authority" over the area. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). The Supreme Court has held that "the consent of one who possesses common authority[3] over

---

[3] The Supreme Court also held that "'common authority' rests 'on mutual use of the property by persons generally having joint access or control for most purposes . . . .'" *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). The defendant does not allege that Repollet did not have sufficient common authority over the bedroom to validly consent to the search.

-9-

premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974).

The Court in *Georgia v. Randolph*, carved out a very simple, clear, and narrow exception to a co-occupant's consent to the search of an area over which the co-occupant has common authority. The Court held that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." 547 U.S. at 122-23. The Court then continued, however, to limit its holding and to carefully preserve *Matlock* and *Rodriguez*:

> we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door *and objects*, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.
>
> This is the line we draw and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication *when he expresses it*.

*Id*. at 121-22 (emphasis supplied). The Court also expressly declined to require "police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." *Id*. at 122.

In this case, although the law enforcement agents admittedly never asked for his consent, Lopez never objected to the search. Because Lopez did not actually object to the search, he does not fall into the narrow exception to the consent doctrine that the Supreme Court carved out in *Georgia v. Randolph*. *See United States v. McKerrell*, 491 F.3d 1221, 1227 (10th Cir. 2007)

("*Randolph* carefully delineated the narrow circumstances in which its holding applied, and . . . employed a rule requiring an express objection by a present co-tenant."). Instead, Lopez falls squarely within the category of individual that is "nearby but not invited to take part in the threshold colloquy." *Georgia v. Randolph*, 547 U.S. at 121.

Lopez argues that the police intentionally removed him for the purpose of avoiding a possible objection to consent. But Lopez has failed to present any evidence to support that claim. To the contrary, the DUSMs did not move him anywhere from the time he came downstairs until after they searched the bedroom, and Lopez was still in the house when Bobnick obtained Repollet's consent. Lopez was simply not invited to take part in the colloquy.

Finally, Lopez submits that this case is distinguishable from *Rodriguez* and *Matlock* because Lopez was far more accessible to the law enforcement agents than were the defendants in those cases. In support of his argument, Lopez stresses the fact that Bobnick or Masterson could have easily called down the stairs, or could have radioed to Moore, who had custody of Lopez, to ask for Lopez's consent. Indeed, it would have been very easy for law enforcement agents to have asked for Lopez's consent. But the Supreme Court in *Georgia v. Randolph* foreclosed that argument by expressly refusing to require the police to take *any* affirmative steps to find a potentially objecting co-tenant before acting on valid consent. The Supreme Court went to great lengths to establish that bright line rule.[4] Therefore, the extent to which a defendant is

---

[4] In weighing the policy considerations behind this rule, the Court held that "[t]here is no ready reason to believe that efforts to invite a refusal would make a difference in many cases, whereas every co-tenant consent case would turn into a test about the adequacy of the police's efforts to consult with a potential objector. Better to accept the formalism of distinguishing *Matlock* from this case than to impose a requirement, time-consuming in the field and in the courtroom, with no apparent systemic justification." *Id*. at 122.

accessible for police to ask for consent is simply not relevant to the analysis under *Georgia v. Randolph*. The police have no duty to seek out a potential objection, no matter how easy or convenient it may be to obtain one. *See United States v. Ayoub*, 2007 U.S. App. LEXIS 19444, *16 (6th Cir. Aug. 16, 2007) ("[T]he Supreme Court . . . made clear that a consensual search will stand where a potential objector . . . never refused consent – even if he was available."). As long as the police officer has not intentionally removed a co-occupant to avoid a possible objection, the onus is on the co-occupant to object, prompted or not. Because Lopez did not object to the search, Repollet's consent was valid and the search was reasonable.

### III. Conclusion

Because Repollet gave voluntary consent to search the shared bedroom, and because Lopez did not actually object to the search, the DUSMs search of Lopez's bedroom and seizure of the gun were reasonable and Lopez's motion to suppress **(doc. # 21)** is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 12th day of September 2007.

          /s/ Stefan R. Underhill
                Stefan R. Underhill
                United States District Judge